**REID COLLINS & TSAI LLP**
William T. Reid, IV (WR-5205)
Olivia A. Palmer (OV-7812)
30 Wall Street
New York, New York 10005
212.344.5200 (telephone)
212.344.5299 (facsimile)

Barbara Whiten Balliette (*pro hac vice*)
Craig A. Boneau (*pro hac vice*)
4301 Westbank Drive
Building B, Suite 230
Austin, Texas  78746
512.647.6100 (telephone)
512.647.6129 (facsimile)

**RUSKIN MOSCOU FALTISCHEK, P.C.**
Mark S. Mulholland (MM-9649)
John A. DeMaro (JD-2084)
Robert F. Regan (RR-1143)
1425 RXR Plaza
Uniondale, New York  11556
516.663.6600 (telephone)
516.663.6705 (facsimile)

*Special Litigation Counsel for Chapter 7 Trustee*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
AT CENTRAL ISLIP

-----------------------------------------------------------------x

In re:
AGAPE WORLD INC., *et al.*

                            Debtors.

-----------------------------------------------------------------x

KENNETH P. SILVERMAN, ESQ., as
Chapter 7 Trustee of Agape World, Inc., *et al.*

                            Plaintiff,

        -against-

MEISTER SEELIG & FEIN, LLP

                          Defendant.

-----------------------------------------------------------------x

Chapter 7
Case No. 09-70660 (DTE)
Substantively Consolidated

Adv. Pro. No._____(DTE)

## **COMPLAINT**

Kenneth P. Silverman, Esq., the Chapter 7 Trustee (the "**Trustee**") of the substantively consolidated bankruptcy estate of Agape World, Inc., Agape Merchant Advance, LLC, Agape Community, LLC, Agape Construction Management, LLC, Agape World Bridges, LLC, and 114 Parkway Drive South, LLC (collectively "**Agape**"), by and for his complaint against Defendant, Meister Seelig & Fein LLP ("**Defendant**" or "**MSF**"), alleges as follows:

## I. NATURE OF THE ACTION

1.      Agape was purportedly a company in the business of making short term bridge loans to commercial borrowers unable to obtain financing through traditional means.  In fact, though, Agape's president, Nicholas Cosmo ("**Cosmo**"), operated Agape as a massive Ponzi scheme.  MSF effectively acted as Agape's general outside counsel since 2007, during which Agape and its innocent investors fell victim to the massive Ponzi scheme Cosmo perpetuated using legal services provided by MSF.  As counsel to Agape, MSF knew or should have known that Cosmo was violating federal securities laws, looting Agape's funds for personal and unauthorized uses, defrauding investors, and operating Agape as a Ponzi scheme.

2.      Cosmo and a network of brokers managed to raise over $400 million from generally unsophisticated and unsuspecting investors, many of whom entrusted their life's savings to Agape.   Only a small fraction of investors' funds was actually used to fund loans, though.  Much of the money went to pay exorbitant commissions and bonuses to the brokers.  In addition, Cosmo looted approximately $100 million of Agape's money to engage in undisclosed and unauthorized commodities and futures trading, resulting in losses of approximately the same amount.  MSF knew Cosmo was looting Agape of millions of dollars in corporate funds for use in risky trading, as well as misappropriating corporate funds for personal use.  Moreover, MSF knew this was not Cosmo's first criminal scheme.

2

3.     Cosmo was a convicted felon, who lost his broker's license in 2000 and was barred from future association in any capacity with any member of the National Association of Securities Dealers ("**NASD**") because of a fraudulent scheme he perpetrated against a previous set of unsuspecting investors.  In his earlier scheme, Cosmo lied about working for a certain reputable brokerage firm.  He took money from investors, supposedly for investment in non-existent brokerage accounts, and used the money for his own purposes.  When his scheme was uncovered, Cosmo pleaded guilty and served time in prison, in addition to being assessed a hefty fine and restitution.  MSF not only knew about Cosmo's 1999 criminal conviction by August 2007, at the latest, but also knew by October 2007 that Cosmo misappropriated Agape funds and used money raised from investors to pay his criminal fine and restitution.  Yet, despite MSF's knowledge of such looting, MSF took no steps to halt Cosmo and protect Agape.

4.     MSF also knew or should have known that Cosmo was causing Agape to sell unregistered and non-exempt securities to the public.  MSF knew or should have known that Cosmo was raising money from investors for the stated purpose of investing in short term bridge loans.  MSF also knew or should have known that the investment agreement Agape entered into with its investors constituted a security under the Securities Act of 1933, 15 U.S.C. §78a *et seq.* (the "**Securities Act**") for which no exemption from registration was available.  Yet, throughout 2007 and most of 2008, and despite being consulted on multiple occasions by Cosmo for advice on whether registration was required, MSF failed to do the necessary factual and legal investigation and analysis necessary to provide competent legal advice to Agape.  Instead, MSF provided the wrong advice to Agape and told Cosmo, on multiple occasions, that registration was not required.  However, in or about October or November 2008, when MSF grew concerned about its own potential criminal or civil exposure arising out of its representation of Agape, MSF

finally performed a sufficient analysis of the issue and reversed its earlier advice, concluding that Agape had been offering unregistered and non-exempt securities for sale.

5.      If MSF had provided competent legal advice regarding Agape's obligations under the Securities Act when Agape first sought such advice – which happened no later than June 27, 2007 – Cosmo's scheme would have been halted in its tracks before hundreds of millions of dollars worth of damages had been inflicted on Agape and its investors. Even if Cosmo had wanted to comply with the Securities Act, he would not have been able to register Agape because the company could not comply with the registration requirements under the Securities Act. Had Agape tried to register, the company's lack of certified financial statements, combined with Cosmo's prior criminal conviction, would have made it impossible to obtain registration. Alternatively, had Cosmo refused to follow the advice that Agape needed to register, MSF's professional and ethical obligations would have made it incumbent on the firm to report Cosmo's actual and intended crimes to Agape's investors and the appropriate regulatory authorities. Thus, had MSF advised Agape properly of its obligations under the federal securities laws, hundreds of millions of dollars of damages to Agape and its investors could have been avoided.

6.      Similarly, MSF's professional and ethical obligations required the firm to report Cosmo's actual and intended crimes to Agape's investors and the appropriate regulatory authorities because MSF knew, or should have known, that Cosmo was operating Agape as a Ponzi scheme. Red flags abounded from the outset of the firm's engagement and only increased as time went by. MSF knew, from the first loan it closed for Agape, that Cosmo was raising money from investors. MSF also knew, or should have known, that Agape's website heralded that investors were involved in every loan. By not later than June 27, 2007, MSF knew that Agape had a form investment agreement it used with investors because Cosmo sent the agreement to MSF for review and advice. By not later than October 2007, MSF knew that

Cosmo was a convicted felon who had swindled investors in the past and that Cosmo misappropriated Agape funds to pay his criminal fine and restitution. And, by not later than November 2007, MSF knew that Cosmo was misappropriating corporate funds that had been raised from investors for the sole, disclosed purpose of making short term bridge loans to open multi-million dollar trading accounts with multiple futures commission merchants ("**FCMs**"). Thus, the evidence of a criminal scheme was substantial and compelled MSF to report Cosmo's actual and intended crimes, but MSF failed to do so, causing and augmenting damages to Agape and its investors.

7.       Moreover, MSF knew or should have known that Cosmo's disastrous trading activities constituted not only a fraud on Agape's investors but also a violation of the Commodity Exchange Act, 7 U.S.C. §1 *et seq.* Yet, instead of taking action to stop Cosmo's fraud by reporting Cosmo's criminal and wrongful activity to Agape's investors, at least some of whom were known to MSF attorneys, or to the Commodities Futures Trading Commission (the "**CFTC**"), MSF continued to represent Agape and assist Cosmo in his fraudulent activity. With MSF's substantial assistance and complicity, Cosmo traded, and ultimately lost, approximately $100 million of money that investors entrusted to Agape to invest in bridge loans.

8.       Instead of disclosing Cosmo's Ponzi scheme to Agape's innocent investors and advising Agape to immediately stop selling securities in violation of federal law, MSF assisted Cosmo by, among other things, (a) failing to properly advise Agape of its obligations under the federal securities laws; (b) structuring loans and other agreements that assisted Cosmo in selling unregistered, non-exempt securities in violation of the Securities Act; (c) assisting Cosmo in misappropriating corporate funds for his own personal purposes as well as undisclosed commodities and futures trading; (d) aiding Cosmo in concealing his fraud from Agape's investors and the authorities; and (e) failing to report Cosmo's illegal conduct to Agape's

investors or the authorities.   Had MSF heeded its professional responsibilities and reported Cosmo's criminal activities to Agape's investors, those investors would have forced Agape into bankruptcy much sooner, as they ultimately did in early 2009.

9.      Not only did MSF repeatedly fail to protect its client, Agape, by failing to disclose Cosmo's fraud to Agape's innocent investors, but MSF actually assisted Cosmo in making misrepresentations about Agape's business.  For example, Cosmo sent a letter to investors dated October 8, 2008 stating, among other things, that the default rate on the loans extended by Agape was only 1% when, in fact, it was at least 50% at the time the misrepresentation was made (the **"October 8, 2008 Letter"**).   MSF saw the October 8, 2008 Letter and knew, or should have known, that the statement regarding default rates was not true.   Yet, when investors directly contacted MSF after receiving the October 8, 2008 Letter and inquired about Agape's financial performance, including demanding to know why they were not able to get their money back, MSF refused to answer their questions and referred the calls to Cosmo, even though MSF knew that Cosmo had already made material false and omissive statements to investors and would likely continue doing so.

10.     Notably, though, the October 8, 2008 Letter did spur MSF to insist that Cosmo issue a corrective statement to investors regarding what MSF wanted investors to believe was the limited scope of MSF's representation of Agape.  Despite knowing that Cosmo had disseminated material misstatements to Agape's investors about the company's business and financial performance, the *only* corrective statement MSF advised Cosmo or Agape to issue was a statement concerning the scope of MSF's representation of Agape.  Thus, although MSF took no steps to protect Agape from Cosmo's on-going criminal conduct, MSF took immediate steps to protect *itself*.

11. When MSF ultimately learned that criminal authorities were investigating Agape, and began to fear its own criminal and financial exposure, MSF seemingly concluded it could no longer sit back and collect hundreds of thousands of dollars in legal fees from Agape. At this point, MSF finally advised Cosmo about some – but not all – of Agape's violations of the law, such as the failure to register under the Securities Act. MSF should have given Agape the same advice concerning the Securities Act almost two years earlier, when it learned Agape was raising money from investors, because all of the necessary facts were available to the firm at that time. But for its failure to do so, tens of millions of dollars in damages, or more, would have been avoided.

12. As the criminal and regulatory authorities began to issue subpoenas, MSF did not advise Cosmo or Agape concerning corrective measures to take, or appropriate alternative courses of action. By all appearances, the firm was more concerned by that point in time with trying to limit its own potential exposure than with providing necessary legal advice to its client. Yet, during the period of time between receiving the October 8, 2008 Letter and finally withdrawing from its representation of Agape, MSF effectively continued to aid Cosmo in concealing and perpetuating his fraudulent and criminal activities. For instance, upon information and belief, MSF knew that, during that period, Cosmo was continuing to try to raise more money from investors and to close additional loans involving restaurants. Despite knowing this, MSF attorneys merely asked to be kept "in the loop" concerning the criminal investigations. MSF also knew, or should have known, that Cosmo was continuing to loot Agape of funds for personal use.

13. On January 22, 2009, MSF finally withdrew from its representation of Agape via a letter to Cosmo. The reason MSF gave for its withdrawal was not the on-going illegal conduct it had known about, or should have known about, for most of its engagement, but rather, that the

October 8, 2008 Letter contained a misrepresentation about the scope of MSF's representation of Agape. MSF claimed that Cosmo had failed to correct the misrepresentation satisfactorily upon request by MSF. MSF knew that the October 8, 2008 Letter also contained material misstatements to investors concerning Agape's financial performance, but MSF never advised Cosmo or Agape of the need to correct those misstatements, and did not mention them in the firm's resignation letter.

14.    Upon information and belief, MSF did nothing to communicate its withdrawal, or the reason for its withdrawal, to any Agape investors, or any Agape officer other than Cosmo, or to any regulatory or criminal authorities. Days after MSF withdrew from its representation, Cosmo was arrested, and shortly thereafter, a group of investors forced Agape into bankruptcy.

15.    Agape and its investors would not have lost hundreds of millions of dollars if MSF had acted in the best interests of Agape by reporting Cosmo's illegal activities. Had MSF honored its duties to Agape and reported what it knew about Cosmo's Ponzi scheme to Agape's innocent officers and investors, they could and would have put an end to Cosmo's scheme by, for instance, forcing Agape into bankruptcy or reporting him to the authorities and/or Agape's investors. Similarly, had MSF reported Cosmo's illegal activities to the regulatory authorities charged with policing commodities and futures trading, securities offerings, and the criminal laws, Cosmo's scheme would have collapsed much sooner. MSF, however, never fulfilled its legal, professional and ethical obligations to Agape and failed to report Cosmo's fraudulent scheme to anyone.

16.    As counsel to Agape, MSF owed Agape the utmost duty of loyalty, candor, and good faith, as well as the duty to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community. MSF violated its duties and

assisted Cosmo in his illegal and fraudulent enterprise.  MSF's negligent legal services fueled Cosmo's scheme and concealed it from Agape's investors and regulators.

17.    Agape seeks to recover the damages that it suffered as a direct result of MSF's negligence, breach of fiduciary duty, and other wrongful conduct.  Agape further seeks to recover contribution from MSF for the firm's role in causing or augmenting Cosmo's fraud on Agape's investors, who have sought recourse against Agape by filing proofs of claims against the company. Agape also seeks to recover, as fraudulent transfers, all payments of fees and costs by Agape to MSF.  MSF did not receive the transfers in objective good faith.  Further, MSF did not provide Agape -- which was insolvent, engaged in a business for which any remaining property was an unreasonably small capital, and intended to incur or believed that it would incur debts that would be beyond its ability to pay as such debts matured, as of the date each transfer to MSF was made -- with reasonably equivalent value or fair consideration in exchange for the payments. Agape also seeks to recover its attorney fees incurred to set aside these transfers.

## II. JURISDICTION AND VENUE

18.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334.

19.    The statutory predicates for the relief sought herein are 11 U.S.C. §§105, 544, 548, 550 and 551.

20.    This Court has jurisdiction over the pendent state law claims pursuant to 28 U.S.C. §1367.

21.    This is both a core proceeding pursuant to 28 U.S.C. §§157(b)(1), 157(b)(2)(A), 157(b)(2)(E), 157(b)(2)(H) and 157(b)(2)(O), and a non-core proceeding under 28 U.S.C. §157(b).

22.    Venue is proper in this Court pursuant to 28 U.S.C. §1409.

### III. **PARTIES AND PROCEDURAL HISTORY**

23.     At all relevant times, Agape World, Inc. was a domestic corporation with principal places of business at 150 Motor Parkway, Suite 106, Hauppauge, New York; 64-13B Grand Avenue, Maspeth, New York; and 82-11 37th Avenue, Suite 602, Jackson Heights, New York.

24.     On February 5, 2009 (the "**Petition Date**"), four petitioning creditors (the "**Petitioning Creditors**") filed an involuntary chapter 7 petition pursuant to 11 U.S.C. §303(b).

25.     On February 9, 2009, the Petitioning Creditors filed a motion to appoint an interim chapter 7 trustee under 11 U.S.C. §303(g).

26.     On February 12, 2009, this Court granted the Petitioning Creditors' motion and entered an order directing the United States Trustee's Office to appoint an interim chapter 7 trustee in Agape's case.

27.     By notice of appointment dated February 12, 2009, the UST appointed Kenneth P. Silverman, Esq. as the interim Trustee in Agape's case; he has since duly qualified and is now the permanent Trustee.

28.     On March 4, 2009, the Court issued an Order for Relief in Agape's chapter 7 case.

29.     On April 14, 2009, the Court issued an Order for Substantive Consolidation.

30.     Defendant Meister Seelig & Fein LLP is a limited liability partnership engaged in the practice of law with its principal place of business at 140 East 45th Street, 19th Floor, New York, New York.

### IV. **FACTUAL STATEMENT**

A.     COSMO OPERATED AGAPE AS A PONZI SCHEME.

31.     Cosmo held out Agape World, Inc. ("**Agape World**"), on its website and through its network of brokers, as a bridge lender in the business of providing short term bridge loans to

10

commercial borrowers unable to obtain financing from traditional sources. The central sales pitch to potential investors was that these short term loans would generate reliable high rates of return. With this sales pitch, Agape World raised in excess of $350 million from more than 5,500 investors. But of that amount, only approximately $18 million was used to fund short term bridge loans.

32.    Cosmo also was the president of Agape Merchant Advance, LLC ("**Agape Merchant**"), which he represented as being in the business of making loans to merchants against credit card and other receivables. Despite raising approximately $50 million from investors, the books and records of Agape Merchant reflect only $5 million in an investment in a related party company. Cosmo was a principal both of Agape World and Agape Merchant (as well as the other debtors) during all periods relevant to this complaint.[1]

33.    MSF provided legal services to Agape Merchant, too, as part of its representation of Agape World. For instance, MSF represented Agape Merchant in connection with the negotiation of an operating agreement with a business partner.

34.    Cosmo used the balance of the hundreds of millions of dollars raised by Agape World and Agape Merchant from investors to fund his own lifestyle, pay exorbitant commissions and bonuses to brokers, and fund his futures and commodities trading scheme. Although some early investors received what they thought at the time were "profits," they were actually paid with money provided by later investors, not genuine profits from any loan deal.

35.    On October 29, 2010, Cosmo pleaded guilty to federal charges of mail and wire fraud in connection with his actions at Agape. As part of his allocution, Cosmo conceded that he operated Agape as a Ponzi scheme and that his unauthorized trading in commodities and futures was a direct part of the scheme:

---

[1] The term "Agape" refers to all Debtor entities collectively. When necessary to distinguish between entities, the full name of the individual entities will be used.

36.    THE DEFENDANT: Beginning 2003, I owned and operated Agape World Incorporated, a New York corporation with offices in Hauppauge and later in Queens, New York.

At a later time I also owned and operated Agape Merchant Advance, LLC, or AMA, from Hauppauge, New York.

Through Agape I, and account representatives working for me, solicited money from investors by representing that Agape would place investors' money in short-term bridge loans to commercial borrowers, and that these loans would be secured by borrowers' interest in various real properties.

I represented that these loans would generate high rates of interest income for the investors.

Through AMA I, and account representatives working for me, also solicited money from investors by representing that AMA would place investors' money in loans to businesses that accepted credit cards and that those loans would generate high rates of interest income for investors.

During the time period between 2003 and January of '09, I opened several commodities and future accounts over which I had sole control.

***Contrary to my promise to limit the use of investors' money to providing short-term commercial loans and business loans, I began trading futures contracts*** betting that various currencies and commodities would perform in a certain manner using Agape and AMA investor money.

I also committed other persons employed at Agape to trade in accounts under my control and, as a result, lost millions of dollars of Agape, AMA and other investors' money in this fraudulent manner.

Although Agape, AMA and myself took in over $400 million investor money, we did not loan out anywhere near that amount in commercial bridge loans or to businesses that accepted credit cards.

***I acknowledge that between 100 and $200 million of investor money was lost due to my unauthorized trading activity and other unauthorized use of investor money***, and that the Court will enter an order of restitution to the victims in an amount of no less than 195 million.

*        *        *

THE COURT: In soliciting additional monies, once you decided that this was not going to work out, did you make deliberate and false material representations to investors?

THE DEFENDANT:  Yes, I did.

And also, sir, it also led to the main reason of the futures trading also. It was a way of trying to make the interest that I was selling to pay these people back.

THE COURT: There's an allegation in the indictment that at some point during this scheme that you were actually using monies that you solicited from new investors and which you told new investors would be invested in, for instance, bridge loans to pay earlier investors so that they basically wouldn't understand it was a problem; is that true?

THE DEFENDANT: That's true.

THE COURT: Just so it's perfectly clear, you did this intentionally?

THE DEFENDANT: Yes, that is true. [2]

37.    Because Agape was a Ponzi scheme, all transfers from Agape were made with the presumed actual intent to hinder, delay or defraud Agape's creditors, including its defrauded investors. Furthermore, Agape was insolvent, engaged in a business for which any remaining property was an unreasonably small capital, and intended to incur or believed that it would incur debts that would be beyond its ability to pay as such debts matured, at all times relevant to the allegations in this complaint.

**B.    MSF's Role in Agape's Collapse and Causing the Investors' Injuries.**

38.    Cosmo retained MSF in February 2007 to represent Agape "in connection with certain financing transactions, general corporate matters and such other legal services as [Agape] may request from time to time." As explained further below, in less than two years — from February 2007 to January 2009 — MSF represented Agape in at least thirty-eight separate matters, including: representing Agape as a mortgage lender in approximately thirty loan transactions; representing Agape in the direct purchase of certain real estate properties; providing legal advice regarding certain equity investments; setting up Agape Merchant; providing legal advice regarding Agape's business practices, such as reviewing Agape's investor contract and

---

[2] Transcript of October 29, 2010 Plea Hearing in *United States v. Nicholas Cosmo,* Cause No. CR-09-255, United States District Court for the Eastern District of New York.

advising the company on whether it needed to register to sell securities under the Securities Act; and representing Agape in connection with its efforts to receive financing from third parties.

39.    The two principal MSF attorneys who handled the Agape engagement were Stuart Rich ("**Rich**"), a partner in MSF's real estate department, who also has experience practicing bankruptcy law, and Judd Cohen ("**Cohen**"), a partner in MSF's corporate department.  Over the course of approximately two years following its retention, MSF billed and collected approximately $400,000 in fees and costs from Agape (the "**Billing Transfers**").  As explained below, MSF did not receive the Billing Transfers in good faith because it knew or should have known that Cosmo was engaged in a fraud and Agape was insolvent.  Additionally, MSF did not provide Agape, which was insolvent, engaged in a business for which any remaining property was an unreasonably small capital, and intended to incur or believed that it would incur debts that would be beyond its ability to pay as such debts matured, as of the date each transfer to MSF was made, with reasonably equivalent value or fair consideration in exchange for the Billing Transfers.

40.    From the outset of its representation, MSF knew or should have known that Cosmo was operating Agape as a Ponzi scheme and looting corporate funds for his own purposes.  As set forth below, MSF negligently enabled and prolonged Cosmo's fraud by, among other things:  (a) failing to properly advise Agape of its obligations under the federal securities laws; (b) structuring loans and other agreements that assisted Cosmo in selling unregistered, non-exempt securities in violation of the Securities Act; (c) assisting Cosmo in misappropriating corporate funds for his own personal purposes as well as undisclosed commodities and futures trading; (d) aiding Cosmo in concealing his fraud from Agape's investors and the authorities; and (e) failing to report Cosmo's illegal conduct to Agape's investors or the authorities.

(1)    **MSF Assists Cosmo in Selling Securities in Violation of Federal Securities Laws.**

      *a.    MSF Knew that Cosmo Raised Millions of Dollars From Individual Investors.*

41.    MSF learned in early 2007 that Cosmo was using Agape to raise money from investors purportedly to invest in commercial real estate.  During February and March 2007, almost immediately after being retained by Agape, MSF represented Agape in connection with a proposed $9.2 million loan to Baja 1000 Development Group I, LLC ("**Baja 1000**").  On March 9, 2007, Cosmo emailed the President and CEO of Baja 1000 saying, in part, "*Agape World Inc has received 3.5 Million US this morning from one group of investors*.... My attorneys have advised me to not fund [with] [sic] the $3.5 Million Agape World Inc. currently received today until all funds to payoff the Mortgage Note is [sic] received." (Emphasis added.)  Cosmo copied Rich, Agape's lead real estate partner at MSF, on the email.  MSF therefore knew from the outset of the firm's representation of Agape that the company was using investor funds.  Similarly, on May 3, 2007, Cosmo sent Rich an email saying, in part, "I have to go meet some investors."

42.    Furthermore, on June 27, 2007, Cosmo sent an email to Cohen attaching a copy of the two-page investment agreement Agape was using with its investors.  Cosmo sent the investment contract to Cohen for the purpose of obtaining legal advice concerning whether the form of the contract was legal and appropriate.  Cohen, a partner in MSF's corporate department, not only reviewed the investor contract himself, but also sent it to another MSF corporate lawyer for review, noting when he did so that the Agape investor agreement was "already saved to the file."  Thus, both Rich and Cohen, the two lead partners on MSF's representation of Agape, received clear and undeniable notification directly from Cosmo, shortly after MSF began to represent Agape, that Cosmo was raising money from investors to fund Agape's loan business.

Case 8-11-09170-reg    Doc 1    Filed 06/22/11    Entered 06/22/11 17:59:39

43.     Moreover, upon information and belief, Cosmo told Rich on multiple occasions that Agape had between 5,000 and 6,000 investors. Cosmo was proud of that fact and enjoyed bragging about it, particularly to people like Rich, whom Cosmo considered a friend. (Indeed, Cosmo was an invited guest at Rich's 40th birthday party.)

44.     Throughout the following year, Cosmo continued to send emails to MSF attorneys, including but not limited to Rich and Cohen, referring to Agape's investors and their direct interest in the loans made by Agape. For example, on April 21, 2008, Cosmo emailed the President of XArena Motor Sports LLC regarding a $1 million loan, copying Rich and another MSF partner. In his email, Cosmo stated that Agape and its "investors" were prepared to foreclose on the loan. And, on August 18, 2008, Cosmo sent Rich an email regarding the delay by Bridgeport Community Partners in paying off a $1.4 million loan relating to Carillion Park. Cosmo told Rich, "I will accept that flat fee [for payoff] only if we close this week. . . . *My investor base* has been extremely patinet [sic] and to still not have a date is ridiculous and unfair." (Emphasis added.)

45.     And, as MSF knew or should have known, Agape's website proclaimed that investors were included in every deal on a page titled, appropriately enough, "Investor Information":

> Investors nationwide have been satisfied for over 8 years and unlike other bridge loan companies, *Agape World Inc. includes our investors in every deal funded!*
> *        *        *
> As our business grows, *investors are always welcome to be a part of our fund raising* [sic]. With our solid business infrastructure and highly accredited name, Agape World Inc. is foreseeing a bright future. Project developers and contractors have sealed our services until 2008 and we are projecting even more opportunities for borrowers and investors alike. Agape World Inc. provides the bridge to your future! (Emphasis added.)[3]

---

[3] Last accessed on Apr. 15, 2011 via Wayback Machine, available at http://web.archive.org/web/*/http://agapeworldinc.net.

16

      *b.*     ***MSF Negligently or Intentionally Assists Cosmo in Violating the Securities Act.***

46.    An objective attorney exercising that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community would have advised Agape that its investor contract was a security that needed to be registered with the Securities and Exchange Commission ("**SEC**") under the Securities Act. Yet, over the course of its representation, MSF negligently and wrongly advised Agape on multiple occasions that the company did not need to register with the SEC pursuant to the Securities Act.

47.    Upon information and belief, between May and June 2007, Cosmo attended a meeting with a reputable bridge lender and James Ludlow, a broker with extensive contacts whom Rich had introduced to Cosmo. During that meeting, the bridge lender warned Cosmo that Agape was selling unregistered and non-exempt securities. Cosmo responded that he had previously sought advice from his lawyers at MSF and they had assured him that Agape did not have to register the securities.

48.    Upon information and belief, after that meeting, out of concern for what he had been told by the bridge lender, Cosmo called Rich and described the conversation. Cosmo again inquired whether Agape needed to register with the SEC. As stated above, Cosmo also emailed the Agape investor contract that he used to solicit investments from investors to Cohen on June 27, 2007. Thus, MSF knew that the investment contract represented that "Agape World Inc. does not purchase, sell, or mortgage any real estate or any other similar vehicles including stocks and equities."

49.    MSF negligently advised Cosmo that Agape did not need to register, but never committed its advice or analysis to writing. Moreover, MSF had multiple chances to review this issue, but failed to perform the analysis of all of the facts within its purview that was essential to rendering sound legal advice. For instance, the issue came up again on April 1, 2008, in

17

connection with Agape's interest in trying to raise money from foreign investors. Rich advised

Cosmo in an email: "We looked into it and as long as you are no[t] issuing securities (which you

are not) then in any Participation Agreement we will need to build in Patriot Act representations

from the investor. That will cover you."

50.    At some point prior to late October 2008, Agape's brokers even started adding the

following disclaimers to their emails:

> This literature is provided for informational purposes only, and *does not constitute an*
> *offer or* solicitation *to buy or sell any security* discussed herein or in any jurisdiction
> where such would be prohibited. (Emphasis added.)

As explained by one Agape broker to another in an October 23, 2008 email, Agape's lawyers —

*i.e.*, MSF — drafted the disclaimer. However, contrary to the disclaimer MSF drafted, Agape

actually *was* making an offer to sell a security. As such, MSF acted as the ghost writer for a

misrepresentation that Cosmo caused Agape to distribute to its investors and potential investors

based on the advice of counsel.

51.    A lawyer exercising that degree of care, skill and diligence commonly possessed

and exercised by a member of the legal community would have advised Agape that the Agape

investment contract was a security, and would further have advised Agape that it was not exempt

from the requirement of registration.

52.    The Securities Act requires that any offer or sale of securities be registered with

the SEC unless the securities qualify for an exemption. Section 2(a)(1) of the Securities Act, as

amended, defines "security" to include, among other things, any "investment contract." The

United States Supreme Court held in *Securities and Exchange Commission v. W. J. Howey Co.*,

328 U.S. 293 (1946) that an "investment contract" is any contract, transaction or scheme

whereby a party makes (a) an investment of money due to (b) an expectation of profits arising

from (c) a common enterprise (d) through the efforts of third parties (the "**Howey Test**"). The

investor contract used by Agape with its investors was a security under the Howey Test because (a) Agape solicited money from investors (b) who had an expectation of profits arising from (c) a common enterprise (d) through the efforts of third parties. Agape's investor contract did not fall within any of the exempted categories of securities identified in the Securities Act.

53.    Section 5 of the Securities Act requires that all securities be registered prior to being sold or distributed, unless they are exempt. An objective attorney exercising that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community would know that, if no exemption applies, a security must be registered. MSF, however, never identified a legitimate basis for not registering Agape with the SEC, as demonstrated by the fact that MSF finally told Cosmo in November 2008 — when the firm was scrambling in fear of its own potential criminal and civil exposure — that Agape had been illegally selling unregistered and non-exempt securities. Thus, throughout its representation of Agape, MSF wrongly advised Agape that it did not need to register. MSF did not provide Agape with the right answer until October or November of 2008, when the firm finally analyzed the issue fully and reached the answer an objective attorney exercising that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community advising a corporate client would have reached more than a year earlier.

54.    Moreover, even when securities are exempt from registration, they remain subject to the anti-fraud provisions of the Securities and Exchange Act (the "**Exchange Act**"). An objective attorney exercising that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community would know that even exempt securities are subject to the anti-fraud laws and would advise a corporate client accordingly.

55.    A reasonably prudent attorney would have advised Cosmo that Agape was violating federal securities laws and, therefore, must immediately stop selling securities. Had

MSF provided this advice, and had Cosmo followed MSF's advice, his scheme would have ended long before 2009 because any effort to prepare a registration statement in early 2007 would have fallen apart, at a minimum, over the issue of certified financial statements, which Agape lacked. Because Agape was a Ponzi scheme, the company would have been unable to procure certified financial statements. Moreover, Cosmo's history as a convicted felon would have created insurmountable problems in registering. In the alternative, had MSF advised Cosmo that Agape needed to register under the Securities Act, and had Cosmo refused to follow MSF's advice, the firm would have had an affirmative obligation under DR7-102 of the New York Code of Professional Responsibility (22 NYCRR 1200.33), as then in effect, to disclose Cosmo's actual and intended crimes.

56.    Indeed, MSF violated the obligations imposed on it under DR 7-102 because, despite receiving information establishing that Cosmo was perpetrating a fraud and engaging in criminal conduct by (i) operating Agape as a Ponzi scheme; (ii) misappropriating corporate funds for private use; (iii) selling unregistered and non-exempt securities to the public; (iv) misappropriating corporate funds for use in undisclosed futures and commodities trading; and (v) materially misrepresenting the financial performance of Agape to investors, MSF failed to disclose Cosmo's intended or actual crimes.

57.    DR 7-102, as in effect at the relevant period, provided:

> A lawyer who receives information clearly establishing that the client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon the client to rectify the same, and if the client refuses or is unable to do so, the lawyer **shall reveal the fraud to the affected person** or tribunal, except when the information is protected as a confidence or secret. (Emphasis added.)

Cosmo's intent to commit criminal violations of the securities laws is not protected as a confidence or secret. Accordingly, to protect both Agape and its investors from Cosmo's criminal conduct, MSF was required to reveal his fraud to Agape's investors.

58.    MSF, however, agreed to continue to represent Agape while Cosmo continued to cause Agape to violate the Securities Act. Had MSF informed Agape's investors of Cosmo's securities violations, the investors would have taken action to stop Cosmo's ongoing fraud. In short, without MSF's complicity, or at the very least, negligence regarding Agape's sale of unregistered and non-exempt securities, Cosmo's scheme would have ended long before his arrest in January 2009.

**(2)    MSF Learns that Cosmo Is a Convicted Felon, But Nonetheless Assists Him in Misappropriating Agape and Investor Funds for His Own Personal Benefit.**

59.    In June 2007, only a few months after being retained by Agape, MSF began work on a transaction involving Cosmo's purchase of a house located at 137 Cardinal Road, in Levittown, New York. At least as early as its work during the course of this representation, MSF learned that Cosmo had been convicted in 1999 of mail fraud related to an investment scheme he orchestrated.

60.    Cosmo purchased the house at 137 Cardinal Road in his own name, with half of the purchase price coming from Agape funds and half from a mortgage loan. On August 1, 2007, the title company working on the mortgage loan sent MSF a report indicating a $212,788.98 outstanding judgment against Cosmo for a 1999 criminal conviction on mail and wire fraud. Cosmo confirmed to Rich that same day that the criminal judgment was, in fact, against him, but Cosmo claimed that it had already been satisfied.

61.    Rich responded blandly to the news that the president of his client, who was the person in charge of raising investor money on behalf of his client, was a convicted felon. Rich sent an email to Cosmo merely saying, "[w]e can execute an affidavit to that effect for the closing that is what is standard. Tell that to Iris [Cajigas, from the title company] that should calm her down. How can we get proof though that the one is satisfied?" Rich did not take any

steps to protect his client, Agape, from any potential liability or issues arising from having a convicted felon in Cosmo's position, as any lawyer exercising that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community would have done on behalf of a corporate client that was responsible for handling investor money.

62.    A reasonably prudent attorney would have, at a minimum, obtained a copy of the publicly-available 1997 indictment of Cosmo, which charged that he "knowingly and intentionally devise[d] a scheme to defraud his brokerage customers and to obtain money and property by means of false and fraudulent pretenses and representations." The judgment of conviction, which is also publicly available, establishes that Cosmo pleaded guilty in 1999 and was sentenced to twenty-one months in prison and intensive gambling therapy. A reasonably prudent attorney would have also known that, as a result of his conviction, Cosmo's broker's license was revoked in 2000 by the National Association of Securities Dealers ("**NASD**"), he was fined $68,209, and he was barred from association with any NASD member in any capacity. These publicly-available facts, which were either known to MSF or should have been known to MSF, should have prompted a diligent investigation by MSF to determine whether Agape' business was legitimate and solvent. Even a minimal inquiry would have exposed Cosmo's fraud and Agape's insolvency immediately.

63.    Shortly after learning about Cosmo's prior criminal conviction, Rich learned that Cosmo had lied to him about whether the judgment had been paid. In fact, Cosmo had not paid the substantial restitution and fine he owed to the Department of Justice (the "**DOJ**") in connection with his prior conviction, but the judgment had to be satisfied before Cosmo could close on the 137 Cardinal Road home. On October 3, 2007, Cosmo sent to MSF via hand delivery a bank check in the amount of $212,788.98 drawn on Agape's corporate account to the order of the DOJ. The memo line of the check included a reference to CR-98-0089, the docket

number for the criminal case in which Cosmo had been convicted and sentenced. Rich acknowledged receipt of the check from Cosmo, but never once raised any question or objection about the fact that Cosmo was looting Agape's funds for personal use. By all appearances, by this point in time, Rich had already lost sight of the fact that the client to whom MSF owed duties was Agape, not Cosmo.

64. Thus, from at least October 3, 2007 and onward, MSF either knew, or should have known, that Cosmo had previously pleaded guilty to mail fraud and was sentenced to twenty-one months in prison, three additional years of supervised release, and ordered to pay $177,000 plus interest in restitution and to participate in intensive gambling therapy. More importantly, MSF knew that Cosmo paid his criminal fine and restitution using corporate funds he had looted from Agape that had been raised from investors who thought they were investing in short term bridge loans. Yet, the day after Cosmo sent the DOJ check to MSF, Cosmo wired $200,000 from Agape's operating account to MSF's Interest on Lawyer Account ("IOLA") to apply towards Cosmo's purchase of the house located at 137 Cardinal Road. Although MSF knew that Cosmo was a convicted felon, and that he treated Agape's bank account as his own personal piggy bank, MSF took no steps to stop this misuse of corporate funds. Moreover, MSF took no steps to ensure that Cosmo had any obligation to repay Agape for the corporate funds used to pay either Cosmo's criminal fine and restitution or to close on the 137 Cardinal Road home. And, while Cosmo later conveyed the 137 Cardinal Road home to an Agape special purpose vehicle for a nominal sum, upon information and belief, Cosmo never repaid Agape for his use of corporate funds to pay his personal criminal fine and restitution.

65. Consequently, even setting aside MSF's earlier failure to advise Agape that it must begin the SEC registration process, by October 2007 MSF knew or should have known that Agape would never be able to successfully register with the SEC. MSF, however, failed to

advise Agape that it must immediately stop selling unregistered securities and raising funds from unsuspecting investors.  If Cosmo refused to stop violating his illegal and fraudulent sale of securities, MSF was obligated to report his criminal conduct to Agape's investors.  But instead of protecting Agape by reporting Cosmo's fraud to Agape's victims, MSF continued to represent Agape and earn considerable fees.  As demonstrated below, MSF's agreement to continue to represent Agape without reporting Cosmo's illegal sale of securities proved disastrous for Agape and its innocent investors.

> **(3)**    **MSF Agrees to Assist Cosmo in Perpetuating His Fraud by Enabling His Unauthorized Commodities and Futures Trading.**

66.    MSF aided Cosmo in opening trading accounts with various FCMs during November 2007, even though MSF knew that Agape held investor funds whose sole disclosed and intended purpose was to fund short term bridge loans, not risky and speculative commodities and futures trading.  Cosmo's prior conviction and NASD bar was a further, huge red flag that MSF chose to ignore in favor of the opportunity for continued legal fees.

67.    Over several years, during which MSF represented Agape, Cosmo opened trading accounts in the name of Agape World, Inc. with Agape funds at a series of FCMs, including some with MSF's knowledge and assistance.  For example, Cosmo copied Rich and Cohen on a November 2, 2007 email he sent to Alaron Trading Corporation ("**Alaron**") in connection with his successful effort to open a futures trading account in Agape's name at Alaron:

> This account was approved open on October 25, 2007.  On October 25th, 2007 I wired from Agape World Inc $5mm to account number xxxx3561.[4] . . . Today is November 2, 2007 and I have not been allowed to trade due to what I was told is continued due diligence. . . . *I have seeked [sic] my council's [sic] opinion on this matter and they are also cc'd above.  Please satisfy this matter today.* (Emphasis added.)

---

[4]  Account numbers are redacted in compliance with Federal Rule of Civil Procedure 5.2.

68.    MSF knew, or should have known, that the only disclosed and authorized use of Agape funds -- which had been raised from investors using a form of investor agreement that Cohen had reviewed – was to make short term bridge loans.  Yet, despite being copied on the correspondence with Alaron, MSF never questioned Cosmo about the misappropriation of Agape funds for use in such risky and undisclosed trading.  Rather, the firm assisted Cosmo's scheme by making the affirmative decision to participate in concealing the source of the funds.  Cosmo eventually lost approximately $16 million of looted Agape and investor funds in the Alaron account alone.

69.    MSF knew or, at the very least, should have known that Cosmo's commodities and futures trading constituted criminal fraud on Agape's investors.  Accordingly, as explained above, MSF had an affirmative obligation to disclose Cosmo's fraud to Agape's investors.  Had Agape's investors known that Cosmo was misappropriating their funds and engaging in criminal violations of the securities and commodities laws, they would have, on information and belief, immediately forced Agape into bankruptcy and reported Cosmo's schemes to the authorities.

70.    By failing to report Cosmo's fraud and continuing to represent Agape and take in hundreds of thousands of dollars in legal fees, MSF effectively agreed to assist Cosmo in his fraud.

71.    On November 9, 2007, Cosmo copied MSF on another email relating to his futures trading; this time, in connection with the account Cosmo was trying to open in Agape's name at TransAct Futures ("**TransAct**"):

> WHILE MY ACCOUNTANTS GATHER THE INFORMATION FOR YOUR
> EXTENDED DUE DILIGENCE I HAVE BEEN INFORMED BY COUNCIL
> [sic] THAT "MY" ASSETS BE WIRED IMMEDIATELY BACK TO "MY"
> FIRM.  THANK YOU.  TODAY IS NOVEMBER 9, 2007.
> 12:02 P EST.. [sic]
> PLEASE WIRE $ [sic] $5,269,925.00          TO:
> BANK OF AMERICA
> *          *          *
> AGAPE WORLD INC OPERATIONS ACCOUNT

72.     Cosmo sought the return of Agape's funds from TransAct because – for obvious reasons – he could not satisfy TransAct's requests for due diligence to establish, among other things, that the Agape account would not be used to trade investor funds.  MSF was involved in Cosmo's effort to obtain the speedy return of Agape's funds from TransAct after the due diligence process caused Cosmo to end his effort to open an account at that firm.  Yet, despite the huge red flag caused by TransAct's refusal to open the trading account, MSF still persisted in assisting Cosmo by concealing that he was actively trying to misappropriate and loot Agape funds so that he could trade investor money in an undisclosed and unauthorized manner.  Upon information and belief, an MSF attorney even spoke on the phone with a representative of TransAct concerning the matter.

73.     Moreover, on November 13, 2007, Cosmo emailed Rich and asked:

> *It [sic] it possible for you to write an opinion letter for me stating I'm 100%*
> *owner of Agape World Inc. and that I'm allowed to use Corporate Funds which*
> *are mine for futures trading.? [sic]*  (Emphasis added.)

74.     Rich forwarded the November 13th email to his partner Cohen within two minutes of receipt, adding:  "See below[.]  What do you think[?]"  According to MSF's billing records, Cohen spent some time that day "review[ing] requested opinions regarding trading account."  MSF, on information and belief, never sent the letter Cosmo requested which, in and of itself, is a demonstration that Rich and Cohen knew that what Cosmo had asked for was wrong.  Had MSF believed Cosmo was, in fact, entitled to trade Agape's funds in this manner,

MSF would have provided the requested letter.  Instead, MSF opted to assist Cosmo by taking the middle path of assisting him in perpetuating his fraud by permitting MSF's name and imprimatur to be used on emails that created the appearance that the firm agreed with and backed Cosmo's false statements.

75.    MSF had actual knowledge of Cosmo's fraud on Agape's investors.  Indeed, MSF's time records reflect a discussion on November 16, 2007 between Cohen and Cosmo regarding "trading account."  Yet MSF willfully ignored Cosmo's fraud and took no action to stop it, because MSF did not want to lose a valuable client.  MSF elected to share in the fruits of Cosmo's fraud by maintaining Agape as a client so that the firm could continue to collect lucrative legal fees.

76.    In addition, an objective attorney, who represented a corporate client and who exercised that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community, would have known that Cosmo's conduct constituted a violation of sections 4b(a)(2)(i) and (iii) of the Commodity Exchange Act, 7 U.S.C. §§6b(a)(2)(i) and (iii), which make it unlawful for any person to cheat or defraud, or attempt to cheat or defraud, any person in connection with orders to make or the making of contracts of sale of commodities, as well as a violation of sections 4(b)(1)(A) and (C), 7 U.S.C. §§6(a)(1)(A) and (C), which make it unlawful for any person, in or in connection with any order to make any contract for the sale of any commodity, to cheat or defraud another person or willfully deceive or attempt to deceive any person with regard to any act of agency performed or with respect to any order for another person.

77.    But for MSF's assistance in concealing the fact that Agape's funds consisted of investor money, Cosmo would not have been able to trade – and ultimately lose – tens of

millions of dollars of investors' money in risky, unauthorized and undisclosed commodities and futures trading.

**(4)    MSF Knew that Cosmo Made Numerous Material Misrepresentations to Agape's Investors But Failed to Correct These Misrepresentations or Disclose Cosmo's Criminal Conduct to Agape's Investors.**

78.    In addition to Cosmo's fraudulent use of Agape's and investors' funds, MSF knew or should have known Cosmo was knowingly making other material misrepresentations to Agape's investors in connection with his sale of securities to these investors.  And as stated above, MSF knew, or should have known, that even exempt offerings of securities are still subject to the anti-fraud provisions of the Exchange Act and Cosmo's willful violation of the Exchange Act's anti-fraud provisions constituted a crime.

79.    MSF knew or should have known that Agape's investor contract and website included material factual misrepresentations, many of which should have been, or actually were, immediately apparent to MSF.  For instance, the investor contract in MSF's files stated, among other things: "Ninety-Nine (99) percent of initial investment is secured by asset lien equaling 125% of investment"; and "*Agape World Inc. does not purchase, sell, or mortgage any real estate or any other similar investment vehicles including stocks and equities*." (Emphasis added.)  Furthermore, the "Investor Information" page of Agape's website stated:

> Our Approved Investors benefit from the model Agape World Inc. provides:
>
> * 99% security of your investment by first position UCC filing.
> * Investors are in complete control of their funds and are able to access at any time.
> * 1099's are issued at the end of the year for interest accrued.
> * Clients are consulted directly and personally with their executive every loan term.
> * Loans terms range from 60 days to 18 months.
> * Each loan is collateralized by 100% commercial asset lien.
> (Emphasis added.)[5]

---

[5] Last accessed on Apr. 15, 2011 via Wayback Machine, available at http://web.archive.org/web/*/http://agapeworldinc.net.

80.     MSF knew, or should have known, that the statements highlighted above were false. As more fully explained above, MSF knew or should have known that Agape was indeed selling securities contrary to its representations to investors. In addition, MSF knew it was the only law firm representing Agape in connection with the bridge loans and consequently knew, or should have known, that: (a) *none* of Agape's investments were 99% secured by a first position UCC filing; (b) Agape's investors did *not* have control or access to their funds at anytime; and (c) *none* of the fourteen loans that MSF actually closed for Agape was collateralized by a 100% commercial asset lien.

81.     Similarly, MSF never advised Agape that other misrepresentations on its website, such as the following, needed to be corrected:

> Agape World Inc. is a private bridge lender since 1999. We do not provide residential mortgages. . . . We are not a mortgage company or regulated lending institution. We do not purchase real estate. We have private sources of financing for bridge loans. Depending on the borrower's time frame and the circumstances, interest-only loans as well as fixed-rate loans are available. Additionally, Agape World Inc. can provide financing at the time of acquisition, or years after an acquisition, in order to free trapped equity. These special situation loans can be placed instead of or alongside conventional financing to provide winning solutions where others may only see problems. Our firm can fund viable transactions of any size. (Emphasis added.)

82.     As counsel for Agape, MSF knew, or should have known, these statements were false because, among other reasons: (a) Agape *did* provide residential mortgages, which MSF knew because it represented Agape in closing residential mortgages; (b) Agape *was* acting as a mortgage company, through mortgage loans prepared by MSF; (c) Agape *did* purchase real estate, on deals where MSF acted as its counsel; and (d) Agape received financing from the *public,* which MSF knew, as demonstrated by the emails Cosmo sent to MSF, among other things.

83.    Upon information and belief, Agape's investors read and relied upon the misrepresentations and omissions in the investment contract and on Agape's website that MSF knew about, or should have known about, yet failed to advise Agape to correct.

84.    Had MSF performed its professional and ethical duties, and advised Agape to correct the misstatements or else MSF would be forced to withdraw from the representation and report Cosmo's crimes to Agape's investors, Cosmo's scheme would have been stopped much earlier and millions of dollars in damages avoided.

### (5)    MSF Finally Withdrew from Its Representation of Agape to Protect Itself, But Only After Causing Harm to Agape and Its Investors.

85.    Throughout its representation of Agape, MSF treated Cosmo as its client, to the detriment of its true client – *Agape*.  MSF's partners may have been motivated by friendship or self-interest, or they may just have negligently lost sight of the identity of their true client.  Upon information and belief, Rich regularly pitched business to Cosmo and recommended additional loans where Agape could act as lender.  On at least two of these occasions, MSF ended up representing both sides in a loan transaction.

86.    However, beginning in October 2008, MSF took steps to distance itself from Cosmo and Agape for the protection of the firm, but at the expense of Agape and its investors.

87.    In October 2008, MSF began receiving letters and phone calls from Agape's investors asking questions about the scope of MSF's representation of Agape and, more ominously, complaining about Agape and threatening to make complaints to criminal authorities. The inquiries to MSF had been prompted by a letter Agape sent to its investors, dated October 8, 2008, that said Agape was "backed by one of New York's top real estate law firms, Meister, Seelig & Fein, LLP."  An Agape investor, Jay Badgett, sent a copy of the October 8th letter to MSF on October 16th, touching off a firestorm within MSF.

88.    After receiving Badgett's letter on October 16, 2008, Rich emailed Cosmo asking for "a copy of any communication you have sent to you [sic] investors that may contain my firm. We need to review it and make sure it does not mischaracterize the scope of our work so that we both avoid any issues."

89.    Meanwhile, as reflected in MSF's billing entries for mid-October through mid-November 2008, MSF finally began to give the time and attention to issues relating to Agape that it should have devoted much earlier.  However, until the firm became concerned that it might be facing liability itself, it had apparently never performed the analysis Agape had requested within months of the firm's retention.  For instance, as reflected in MSF's time records, MSF lawyers finally did the following after receiving Badgett's letter:

- Conference call . . . regarding securities laws issues.
- . . . call to clients and discuss investor issues with S. Rich.
- Discuss investor issues and call from investors with S. Rich.
- Conference  . . . regarding loan security matter.
- Discuss corporate/investor issues. . .
- Review various investor contracts and disclosures and PPLLC documents re: securities issues, discuss with S. Rich. . .
- Call . . . regarding securities law issues.
- Research on facts of Cosmo complaint and potential SEC actions.
- Conferences . . . regarding client's procedures for and documents covering its receipts of funds from investors and related matters; legal research; reviewed client documents.
- Review investor agreement. . .
- Meeting . . . to discuss current status of the client's business and various related matters; reviewed letter from an Agape investor . . .
- Meet . . . regarding corporate and securities issues.
- Prepare for and meet with client re: structural offering, securities and related issues.

90.    During this period, while MSF was researching the securities laws and investor issues, various partners of the firm met with Cosmo in person on November 4, 7 and 17, 2008. Kenneth Goodwin, one of MSF's partners, who is a former attorney with the Division of Enforcement of the Securities and Exchange Commission, attended at least one of these meetings with Cosmo.  Upon information and belief, during at least one of these meetings, MSF advised

31

Cosmo that Agape had been selling unregistered and non-exempt securities to the public; however, that advice was based on facts that had been available to MSF almost from the outset of the firm's representation of Agape.

91.    Upon information and belief, MSF also raised the possibility of having Agape file for bankruptcy protection during the October or November 2008 time frame.  However, Rich, the MSF partner Cosmo had interacted with the most during the course of the firm's representation of Agape, advised Cosmo that Agape should not "rush" to file bankruptcy.  Rich advised Cosmo to delay making any decision to file for bankruptcy; he also advised Cosmo that he had a good bankruptcy attorney in mind that Agape should use if it did ultimately elect to file for bankruptcy.

92.    With respect to the October 8, 2008 Agape letter to investors, MSF insisted that Cosmo send a correction to investors that clarified the firm's role.  Tellingly, although there were numerous material misstatements and omissions in the letter to investors that were obvious and known to MSF, the only correction MSF demanded was that Cosmo insert a statement limiting MSF's role as counsel to Agape.

93.    Rich edited a copy of the October 8, 2008 Letter by hand, so that it would read "we are ~~backed~~ *represented on our lending transactions* by one of New York's top real estate law firms, Meister, Seelig & Fein, LLP," and sent it back to Cosmo.  Rich's "correction," of course, was simply a different variety of misstatement.  In fact, as set forth in the February 9, 2007 engagement letter, and as confirmed by MSF's billing records, MSF had advised Agape in general corporate matters, including providing the negligent advice that Agape was not selling unregistered securities, and did not merely act as counsel on discrete lending transactions.

94.    Upon information and belief, Cosmo sent an "email blast" to investors with another version of the October 8, 2008 Letter that reflected Rich's one correction.  Upon

information and belief, Cosmo told Rich that he had sent the correction via email blast, rather than via mail, because Agape could not afford to do a mass mailing at that time.

95.    MSF never, at any time, took any steps to correct any of the other obvious material misrepresentations and omissions in the letter to Agape's investors or to urge Cosmo to do so.  Specifically, the October 8, 2008 Letter to investors also stated that:

> [Since mid-2007] . . . we have successfully closed over thirty loans with one extension.
>
> *        *        *
>
> Agape World's default rate is less than 1% over the past decade due to our strict lending guidelines.
>
> *        *        *
>
> Agape World Inc. successfully closed on two loans this past week [the first week of October 2008] as scheduled and its outlook on the future is filled with confidence.
>
> *        *        *
>
> Agape World Inc. is a registered depository institution for Bank of America.

96.    MSF knew that each of these statements was false.  First, Agape had closed only fourteen — not "over thirty" — loans with MSF, and MSF knew that it was the only law firm representing Agape in connection with these loans.  Second, seven of the fourteen loans were in default or foreclosure — in other words, 50%, not "less than 1%", of the loans had defaulted — which MSF knew, since it was representing Agape in connection with the foreclosure proceedings.  Third, Agape had not successfully closed on two loans during the first week of October — in fact, as the only law firm assisting Agape in connection with its bridge loans, MSF knew that Agape had not closed *any* loans in the preceding three months.  And fourth, Agape was never a "registered depository institution" for Bank of America or any other bank.

97.    Notably, the October 8, 2008 Letter was entirely silent on the topic of Cosmo's futures and commodities trading, a topic that one would have expected to see covered in an update to investors — *if* the trading was authorized and legitimate.  Upon information and belief, the fact that Cosmo made no mention of the multi-million dollar futures and commodities trading

accounts he had opened in Agape's name using money raised from investors was not lost on MSF.

98.     In an October 28, 2008 email to Cosmo, though, in which Rich was still focused on concerns raised by the October 8, 2008 Letter, Rich's sole subject was, once again, trying to protect MSF.  At this time, MSF was still counsel to Agape, but there is no suggestion in Rich's email that any consideration was being given by the law firm to Agape's legal interests.  Rather, Rich asked Cosmo to send the following statement to all of Agape's brokers, further minimizing MSF's representation of Agape:

> I would state it as follows.
>
> 'To clarify any information previously provided to you concerning the scope of the representation of Agape by Meister Seelig & Fein LLP.  Please be advised that Meister Seelig & Fein LLP has acted and continues to act as counsel to Agape in transactions where Agape is a lender in a real estate transaction.  This is the scope of their representation of Agape and in no other area of Agape's business.'

99.     The implication is plain that by disclaiming involvement "in any other area of Agape's business" outside of "real estate transaction[s]," MSF was trying to create a paper trail distancing the firm from Cosmo's disastrous trading scheme that resulted in approximately $100 million in losses.  Yet, as MSF's billing records reveal, MSF had known about the FCM trading accounts since November 2007, at the latest, and had even provided substantial assistance to Cosmo in opening various trading accounts, as set forth above, by choosing to conceal Cosmo's looting of Agape funds.

100.    Ultimately, on January 22, 2009, MSF sent Agape a letter withdrawing from its representation of the company.  The stated basis for MSF's withdrawal was Agape's failure to sufficiently correct misstatements regarding the scope of the firm's representation of Agape.  By the time MSF terminated its representation of Agape, MSF had received inquiries from criminal

authorities and, upon information and belief, had already retained criminal counsel to represent the firm.

101.    Meanwhile, during the weeks in between the October 8, 2008 Letter (a copy of which MSF had at least as early as October 16, 2008) and the date a group of defrauded investors finally forced Agape into bankruptcy, Agape and its creditors suffered staggering losses that could have been stemmed had MSF focused on providing competent and necessary legal advice to Agape.  Between October 8, 2008 and January 30, 2009, total transfers of approximately *$46 million dollars* were made from Agape accounts.  Of that amount, approximately $12.8 million was transferred to Agape brokers and other insiders and approximately $2 million was transferred to FCMs.  Had MSF acted as a reasonably prudent attorney and advised Agape to seek criminal counsel, or file for bankruptcy, or cease all cash distributions at the same time that the firm told Cosmo Agape had been selling unregistered securities, tens of millions of dollars might have been preserved for the benefit of the estate and its creditors.  Instead, between October 2008 and January 2009, MSF set about trying to shore up its own legal defenses, at the expense of Agape – which was still a firm client – and its investors.  In fact, had MSF acted in accordance with the industry standard of care, the scheme would have ended long before October 2008.

102.    Upon information and belief, MSF maintains a client matter number (code 114) for work that MSF claims it performed on behalf of the firm, rather than on behalf of Agape. Upon information and belief, substantial work performed during October, November and December of 2008, as well as during January 2009, is reflected in matter 114.  Upon information and belief, during the critical time frame when tens of millions of dollars could have been preserved for the benefit of Agape and its creditors, MSF spent more time analyzing its own potential criminal and civil liability than advising Agape on an appropriate course of action.  But

for MSF's failure to advise the company as an objective attorney, who represented a corporate client and who exercised that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community, Agape could have been placed in bankruptcy months earlier and tens of millions of dollars could have been preserved for the benefit of the estate and its investors, who would have stood to recover a greater percentage of their money.

103.    Certainly, by October 16, 2008 at the latest, MSF could no longer stand by and permit Cosmo to continue using Agape as an instrument of fraud.  The firm had an obligation to report the intended commission of a crime, as well as the obligation not to assist in the commission of a crime or fraud.  MSF failed to take the minimum steps necessary to meet its professional and legal obligations.

104.    MSF failed to abide by the obligations imposed on attorneys by the New York Code of Professional Responsibility in effect at the relevant time.  MSF had an affirmative obligation under DR 7-102 to disclose intended or actual crimes.  The crimes MSF was aware of, or should have been aware of, include Agape's offering unregistered, non-exempt securities for sale to the public, the misrepresentations and omissions on Agape's website and in its communications with investors, and Cosmo's misappropriation of Agape's funds (which had been raised from investors) to trade commodities and futures, as well as for personal use.  Had MSF disclosed the crimes of which it was aware immediately upon becoming aware of them, millions of dollars worth of damages to Agape and its investors would have been avoided because Cosmo's scheme would have been shut down, either by regulators or by Agape investors.

105.    Alternatively, MSF had an obligation under the New York Rules of Professional Conduct in effect at the relevant time, to withdraw immediately from its representation of Agape when MSF knew or suspected that a crime had been committed, that Cosmo intended to commit

additional crimes, and that MSF's continued representation of Agape under the circumstances would constitute assistance in the crime. *See* 22 NYCRR 1200.15. Had MSF disclosed the intent to commit crimes immediately upon becoming aware of such intent, millions of dollars worth of damages to Agape and its investors would have been avoided. Instead, though, upon information and belief, MSF retained criminal counsel for *itself*, which is effectively an admission that circumstances existed that warranted MSF's advising the Agape investors that were known to the firm of Cosmo's crimes.

106.    Cosmo was arrested on January 26, 2009, just days after MSF finally terminated its representation of Agape, via a letter dated January 22, 2009. Cosmo has since pleaded guilty to charges of mail and wire fraud in connection with his actions at Agape and is awaiting sentencing.

107.    MSF's actions substantially harmed Agape. Its actions proximately caused Agape to suffer misappropriation of its corporate funds for use in risky commodities and futures trading and subjected Agape to third-party liabilities that otherwise would not have occurred. Agape also suffered millions of dollars in costs as a result of the substantial administrative costs of its Chapter 7 bankruptcy, which has been so expensive due, in large part, to the length of time MSF allowed the fraud to continue and the extent to which it grew over time. Had MSF provided Agape with the advice that it was required to register under the Securities Act at the outset of its engagement, Cosmo's scheme would literally have collapsed — or been exposed — almost immediately, and certainly long before *thousands* of investors had been defrauded. MSF's negligent and wrongful acts and omissions enabled, concealed and prolonged Cosmo's fraudulent schemes. Additionally, MSF's failure to report the fraud that it either did suspect, or should have suspected, permitted the fraud to continue much longer than would otherwise have been the case.

**C.     COSMO'S ACTIONS WERE EXCLUSIVELY ADVERSE TO AGAPE'S INTERESTS, BUT AGAPE'S INNOCENT STAKEHOLDERS COULD AND WOULD HAVE PREVENTED THE WRONGDOING.**

108.    At all relevant times, Cosmo acted exclusively adverse to Agape's interests because he was admittedly operating Agape as Ponzi scheme, which is necessarily adverse to the interests of the company, and he was looting the company of funds for personal and other improper and unauthorized uses.  At all times, Cosmo:  (a) placed his interests ahead of Agape's interests; (b) acted in his own best interests to Agape's detriment; and (c) concealed the details of his improper and unauthorized activities, such as his massive and disastrous commodities and futures trading, from Agape's investors and regulators, such as the SEC and the CFTC.  In fact, Cosmo's $100 million dollars in futures bets made with Agape money constituted outright looting and misappropriation.  Agape received absolutely no benefit from Cosmo's actions. Cosmo engaged in these harmful acts to perpetuate his fraudulent schemes.

109.    At all relevant times, though, Agape had innocent investors and officers, who had no knowledge of Cosmo's wrongdoing and who could have and would have substantially prevented or otherwise mitigated the losses that occurred had MSF properly notified them of the scheme.  Indeed, a group of Agape investors eventually put Agape in bankruptcy when Cosmo's fraud was finally exposed.  This would have happened much earlier, but for MSF's complicity with Cosmo in concealing his schemes.

110.    In addition, given that MSF knew that Cosmo concealed from FCMs the fact that he was trading investor money, MSF could have, and should have, made voluntary reports of suspected crimes to the CFTC, which has jurisdiction over commodities and futures trading, or to the local criminal authorities.  By failing to report Cosmo's known illegal activity, MSF failed to perform its fiduciary duties to Agape and failed to fulfill its professional and ethical obligations. Had the CFTC been notified earlier, it would have commenced a proceeding against Cosmo to

restrain all further activities in Agape accounts, as actually happened on January 27, 2009, one day after Cosmo's arrest.

**D.    MSF HAD DOMINION AND CONTROL OVER THE TRANSFERS**

111.    MSF had dominion and control over the Billing Transfers (*i.e.*, the legal fees Agape paid to MSF).  In addition, pursuant to the retainer agreement between MSF and Agape, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF exercised its dominion and control over the funds Agape deposited in its IOLA by deducting for its own benefit a total of $28,574.87 in legal fees in connection with the 137 Cardinal Road transaction.  MSF withdrew $5,000 on October 11, 2007 (the "October 11, 2007 Transfer"), and an additional $23,574.87 on March 19, 2008 (the "March 19, 2008 Transfer"), from its IOLA as legal fees in connection with the 137 Cardinal Road transaction, although these amounts do not appear on MSF's client billing summary for Agape.  These two transfers are additional legal fees paid to MSF by Agape in addition to the Billing Transfers. (The October 11, 2007 transfer and the March 19, 2008 transfer, together, are the "**Cardinal Road Transfers**").

**E.    MSF DID NOT ACT IN GOOD FAITH IN RECEIVING TRANSFERS FROM AGAPE.**

112.    As more fully set forth above, MSF did not act reasonably in receiving the Billing Transfers and the Cardinal Road Transfers from Agape.  MSF was, at the very least, on inquiry notice that Agape's business was a fraudulent scheme.  It was objectively impossible for a reasonable attorney, acting in good faith, to ignore the likelihood that Cosmo was using Agape funds and MSF's legal services in a fraudulent manner.

# V. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF
### 11 U.S.C. §§548(a)(1)(A) – FRAUDULENT TRANSFER AND 550(a)

113.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

114.    Between February 9, 2007 and January 7, 2009, Agape caused the Billing Transfers to be made to MSF as payment for legal fees and costs, as follows:

| Date Paid | Amount Paid |
|---|---|
| February 9, 2007 | $3,000.00 |
| February 14, 2007 | $10,000.00 |
| March 1, 2007 | $12,500.00 |
| April 3, 2007 | $10,000.00 |
| April 11, 2007 | $1,680.00 |
| April 27, 2007 | $7,726.95 |
| May 3, 2007 | $5,000.00 |
| May 4, 2007 | $2,500.00 |
| May 8, 2007 | $5,000.00 |
| May 16, 2007 | $11,500.00 |
| May 23, 2007 | $13,593.19 |
| May 30, 2007 | $5,000.00 |
| June 1, 2007 | $3,225.00 |
| June 4, 2007 | $1,975.00 |
| June 5, 2007 | $17,453.33 |
| June 14, 2007 | $5,000.00 |
| June 20, 2007 | $8,500.00 |
| June 21, 2007 | $10,000.00 |
| June 22, 2007 | $5,000.00 |
| June 27, 2007 | $2,500.00 |
| July 12, 2007 | $5,000.00 |
| July 13, 2007 | $9,500.00 |
| July 18, 2007 | $6,642.26 |
| July 26, 2007 | $10,000.00 |
| July 30, 2007 | $10,434.34 |
| August 20, 2007 | $4,661.00 |
| October 3, 2007 | $1,500.00 |
| October 5, 2007 | $2,500.00 |
| October 11, 2007 | $2,000.00 |
| October 15, 2007 | $4,773.20 |
| October 17, 2007 | $2,962.50 |
| October 18, 2007 | $5,000.00 |
| October 22, 2007 | $5,240.34 |
| October 25, 2007 | $807.50 |

| | |
|---|---|
| October 26, 2007 | $2,500.00 |
| October 29, 2007 | $4,000.00 |
| November 5, 2007 | $1,455.50 |
| November 28, 2007 | $2,500.00 |
| December 10, 2007 | $1,455.50 |
| December 20, 2007 | $73.20 |
| December 26, 2007 | $1,277.69 |
| December 28, 2007 | $21,274.00 |
| January 31, 2008 | $150.00 |
| February 20, 2008 | $533.35 |
| March 19, 2008 | $33,365.61 |
| April 15, 2008 | $5,000.00 |
| May 27, 2008 | $12,674.60 |
| June 16, 2008 | $5,623.18 |
| June 17, 2008 | $15,236.73 |
| June 24, 2008 | $2,500.00 |
| July 11, 2008 | $3,454.19 |
| July 16, 2008 | $2,500.00 |
| September 3, 2008 | $80.00 |
| September 8, 2008 | $2,309.00 |
| September 26, 2008 | $104.00 |
| October 16, 2008 | $9,341.60 |
| October 30, 2008 | $11,631.72 |
| November 14, 2008 | $21,935.96 |
| January 7, 2009 | $19,000.64 |

**Total Billing Transfers**          **$392,151.08**

115.    Pursuant to the February 9, 2007 engagement letter between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over the funds once they were deposited in MSF's IOLA for Agape's benefit.  MSF exercised that dominion and control by withdrawing Agape funds held in its IOLA in satisfaction of legal fees and costs.

116.    The Billing Transfers were property in which Agape had an interest.

117.    The Billing Transfers were made with actual intent to hinder, delay and defraud Agape's creditors.

118.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Billing Transfers.

41

119.    Pursuant to 11 U.S.C. §548(a)(1)(A), the Trustee may avoid the Billing Transfers and MSF may not have a lien upon the property nor retain any interest in it.

120.    On October 11, 2007, MSF caused the October 11, 2007 Transfer to be made to MSF, from Agape's funds in MSF's IOLA, in the amount of $5,000.  On March 19, 2008, MSF caused the March 19, 2008 Transfer to be made to MSF, from Agape's funds in MSF's IOLA, in the amount of $23,574.87 (the October 11, 2007 Transfer and the March 19, 2008 Transfer, together, are the "**Cardinal Road Transfers**").

121.    Pursuant to the retainer agreement between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over Agape's funds once they were deposited in MSF's IOLA.  Moreover, as alleged above, MSF exercised its dominion and control over these funds when it withdrew $28,574.87 from the account as payment for its legal fees in the form of the October 11, 2007 Transfer and the March 19, 2008 Transfer.

122.    The Cardinal Road Transfers were property in which Agape had an interest.

123.    The Cardinal Road Transfers were made with actual intent to hinder, delay and defraud Agape's creditors.

124.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Cardinal Road Transfers.

125.    Pursuant to 11 U.S.C. §548(a)(1)(A), the Trustee may avoid the Cardinal Road Transfers and MSF may not have a lien upon the property nor retain any interest in it.

126.    Pursuant to 11 U.S.C. §550(a), the Trustee may recover, for the benefit of the estate, all of the Billing Transfers made to MSF, in an amount to be determined at trial, but not less than $392,151.08, plus prejudgment interest.

127.    Pursuant to 11 U.S.C. §550(a), the Trustee may recover, for the benefit of the estate, all of the $28,574.87 in Cardinal Road Transfers made to MSF, plus prejudgment interest.

## SECOND CLAIM FOR RELIEF
### 11 U.S.C. §§548(a)(1)(B) – FRAUDULENT TRANSFERS AND 550(a)

128.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

129.    Between February 9, 2007 and January 7, 2009, Agape caused the Billing Transfers to be made to MSF as payment for legal fees and costs, as set forth in detail above.

130.    Pursuant to the February 9, 2007 engagement letter between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over Agape's funds once they were deposited in MSF's IOLA.

131.    The Billing Transfers were property in which Agape had an interest.

132.    Based on MSF's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, Agape, which was insolvent on the dates of each and every one of the Billing Transfers, received less than a reasonable equivalent value in exchange for each and every one of the Billing Transfers. Moreover, on the dates of each and every one of the Billing Transfers, Agape was engaged in business for which any property remaining with Agape was an unreasonably small capital, and Agape intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

133.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Billing Transfers.

134.    Pursuant to 11 U.S.C. §548(a)(1)(B), the Trustee may avoid the Billing Transfers and MSF may not have a lien upon the property nor retain any interest in it.

135.    On October 11, 2007 and March 19, 2008, Agape caused the Cardinal Road Transfers to be made to MSF as payment for legal fees and costs, as set forth in detail above.

136.    Pursuant to the retainer agreement between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over the Cardinal Road Transfers once the funds were deposited in Agape's IOLA.    Moreover, as alleged above, MSF exercised its dominion and control over Agape's funds when it withdrew $28,574.87 from the account as payment for its legal fees in the form of the October 11, 2007 Transfer and the March 19, 2008 Transfer.

137.    The Cardinal Road Transfers were property in which Agape had an interest.

138.    Agape was insolvent on the dates of the Cardinal Road Transfers and received less than a reasonable equivalent value in exchange for such transfers.    On the dates of the Cardinal Road Transfers, Agape was engaged in business for which any property remaining with Agape was an unreasonably small capital, and Agape intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

139.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Cardinal Road Transfers.

140.    Pursuant to 11 U.S.C. §548(a)(1)(B), the Trustee may avoid the Cardinal Road Transfers and MSF may not have a lien upon the property nor retain any interest in it.

141.    Pursuant to 11 U.S.C. §550(a), the Trustee may recover, for the benefit of the estate, all of the Billing Transfers made to MSF, in an amount to be determined at trial, but not less than $392,151.08, plus prejudgment interest.

142.    Pursuant to 11 U.S.C. §550(a), the Trustee may recover, for the benefit of the estate, all of the $28,574.87 in Cardinal Road Transfers made to MSF, plus prejudgment interest.

### THIRD CLAIM FOR RELIEF
NEW YORK DEBTOR AND CREDITOR LAW §273 – CONVEYANCES BY INSOLVENT
AND 11 U.S.C. 544

143.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

144.    Between February 9, 2007 and January 7, 2009, Agape caused the Billing Transfers to be made to MSF as payment for legal fees and costs, as set forth in detail above.

145.    Pursuant to the February 9, 2007 engagement letter between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over Agape's funds once they were deposited in MSF's IOLA.

146.    The Billing Transfers were property in which Agape had an interest.

147.    Based on MSF's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, Agape, which was insolvent on the dates of each and every one of the Billing Transfers, made these transfers to MSF without receiving fair consideration.

148.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Billing Transfers.

149.    Accordingly, the Billing Transfers are:  (a) fraudulent under New York Debtor and Creditor Law §273 and (b) voidable under New York Debtor and Creditor Law §278.

150.    As a direct, foreseeable, and proximate result of the fraudulent transfers, Agape's creditors have been damaged and the Trustee seeks to set aside the fraudulent transfers to satisfy their losses.

151.    On October 11, 2007 and March 19, 2008, Agape caused the Cardinal Road Transfers to be made to MSF as payment for legal fees and costs, as set forth in detail above.

152.     Pursuant to the retainer agreement between Agape and MSF, as well as New York State Judiciary Law §497(21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over the Cardinal Road Transfers once the funds were deposited in Agape's IOLA.  Moreover, as alleged above, MSF exercised its dominion and control over these funds when it withdrew $28,574.87 from the account as payment for its legal fees in the form of the October 11, 2007 Transfer and the March 19, 2008 Transfer.

153.     The Cardinal Road Transfers were property in which Agape had an interest.

154.     Agape was insolvent on the dates of the Cardinal Road Transfers and such transfers to MSF without receiving fair consideration.

155.     MSF cannot meet its burden of establishing that it acted in good faith in accepting the Cardinal Road Transfers.

156.     Accordingly, the Cardinal Road Transfers are:  (a) fraudulent under New York Debtor and Creditor Law §273 and (b) voidable under New York Debtor and Creditor Law §278.

157.     As a direct, foreseeable, and proximate result of the fraudulent transfers, Agape's creditors have been damaged and the Trustee seeks to set aside the fraudulent transfers to satisfy their losses.

158.     Pursuant to 11 U.S.C. §544, the Trustee may recover, for the benefit of the estate, all of the Billing Transfers made to MSF, in an amount to be determined at trial, but not less than $392,151.08, plus prejudgment interest.

159.     Pursuant to 11 U.S.C. §544, the Trustee may recover, for the benefit of the estate, all of the $28,574.87 in Cardinal Road Transfers made to MSF, plus prejudgment interest.

## FOURTH CLAIM FOR RELIEF
### NEW YORK DEBTOR AND CREDITOR LAW §274 – CONVEYANCES BY PERSONS IN BUSINESS AND 11 U.S.C. 544

160.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

161.    Between February 9, 2007 and January 7, 2009, Agape caused the Billing Transfers to be made to MSF as payment for legal fees and costs, as set forth in detail above.

162.    Pursuant to the February 9, 2007 engagement letter between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over Agape's funds once they were deposited in MSF's IOLA.

163.    The Billing Transfers were property in which Agape had an interest.

164.    Based on MSF's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, Agape, which was insolvent on the dates of the Billing Transfers, made these transfers to MSF without receiving fair consideration.

165.    On the dates of each and every one of the Billing Transfers, Agape was engaged in a business for which any property remaining with Agape after the transfers was an unreasonably small capital.

166.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Billing Transfers.

167.    Accordingly, the Billing Transfers are: (a) fraudulent under New York Debtor and Creditor Law §274 and (b) voidable under New York Debtor and Creditor Law §278.

168.    As a direct, foreseeable, and proximate result of the fraudulent transfers, Agape's creditors have been damaged and the Trustee seeks to set aside the fraudulent transfers to satisfy their losses.

169.    On October 11, 2007 and March 19, 2008, Agape caused the Cardinal Road Transfers to be made to MSF as payment for legal fees and costs, as set forth in detail above.

170.    Pursuant to the retainer agreement between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over the Cardinal Road Transfers once the funds were deposited in MSF's IOLA. Moreover, as alleged above, MSF exercised its dominion and control over these funds when it withdrew $28,574.87 from the account as payment for its legal fees in the form of the October 11, 2007 Transfer and the March 19, 2008 Transfer.

171.    The Cardinal Road Transfers were property in which Agape had an interest.

172.    Agape was insolvent on the dates of the Cardinal Road Transfers and made the transfers to MSF without receiving fair consideration.

173.    On the dates of the Cardinal Road Transfers, Agape was engaged in a business for which any property remaining with Agape after the transfers was an unreasonably small capital.

174.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Cardinal Road Transfers.

175.    Accordingly, the Cardinal Road Transfers are: (a) fraudulent under New York Debtor and Creditor Law §274 and (b) voidable under New York Debtor and Creditor Law §278.

176.    As a direct, foreseeable, and proximate result of the fraudulent transfers, Agape's creditors have been damaged and the Trustee seeks to set aside the fraudulent transfers to satisfy their losses.

177. Pursuant to 11 U.S.C. §544, the Trustee may recover, for the benefit of the estate, all of the Billing Transfers made to MSF, in an amount to be determined at trial, but not less than $392,151.08, plus prejudgment interest.

178. Pursuant to 11 U.S.C. §544, the Trustee may recover, for the benefit of the estate, all of the $28,574.87 in Cardinal Road Transfers made to MSF, plus prejudgment interest.

**FIFTH CLAIM FOR RELIEF**<br>**NEW YORK DEBTOR AND CREDITOR LAW §275 – CONVEYANCES BY PERSONS ABOUT TO INCUR DEBTS AND 11 U.S.C. 544**

179. Plaintiff Trustee repeats and realleges herein each and every allegation made above.

180. Between February 9, 2007 and January 7, 2009, Agape caused the Billing Transfers to be made to MSF as payment for legal fees and costs.

181. Pursuant to the February 9, 2007 engagement letter between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over Agape's funds once they were deposited in MSF's IOLA.

182. The Billing Transfers were property in which Agape had an interest.

183. Based on MSF's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, Agape, which was insolvent on the dates of the Billing Transfers, made these transfers to MSF without receiving fair consideration.

184. On the dates of each and every one of the Billing Transfers, Agape intended or believed that it would incur debts beyond its ability to pay as they matured.

185. MSF cannot meet its burden of establishing that it acted in good faith in accepting the Billing Transfers.

186.    Accordingly, the Billing Transfers are: (a) fraudulent under New York Debtor and Creditor Law §275 and (b) voidable under New York Debtor and Creditor Law §278.

187.    As a direct, foreseeable, and proximate result of the fraudulent transfers, Agape's creditors have been damaged and the Trustee seeks to set aside the fraudulent transfers to satisfy their losses.

188.    On October 11, 2007 and March 19, 2008, Agape caused the Cardinal Road Transfers to be made to MSF as payment for legal fees and costs, as set forth in detail above.

189.    Pursuant to the retainer agreement between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over the Cardinal Road Transfers once the funds were deposited in Agape's IOLA.  Moreover, as alleged above, MSF exercised its dominion and control over these funds when it withdrew $28,574.87 from the account as payment for its legal fees in the form of the October 11, 2007 Transfer and the March 19, 2008 Transfer.

190.    The Cardinal Road Transfers were property in which Agape had an interest.

191.    Agape was insolvent on the dates of the Cardinal Road Transfers and made the transfers to MSF without receiving fair consideration.

192.    On the dates of the Cardinal Road Transfer, Agape intended or believed that it would incur debts beyond its ability to pay as they matured.

193.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Cardinal Road Transfers.

194.    Accordingly, the Cardinal Road Transfers are: (a) fraudulent under New York Debtor and Creditor Law §275 and (b) voidable under New York Debtor and Creditor Law §278.

195.    As a direct, foreseeable, and proximate result of the fraudulent transfers, Agape's creditors have been damaged and the Trustee seeks to set aside the fraudulent transfers to satisfy their losses.

196.    Pursuant to 11 U.S.C. §544, the Trustee may recover, for the benefit of the estate, all of the Billing Transfers made to MSF, in an amount to be determined at trial, but not less than $392,151.08, plus prejudgment interest.

197.    Pursuant to 11 U.S.C. §544, the Trustee may recover, for the benefit of the estate, all of the $28,574.87 in Cardinal Road Transfers made to MSF, plus prejudgment interest.

## SIXTH CLAIM FOR RELIEF
### New York Debtor and Creditor LAW §276 – CONVEYANCE Made by Transferor with Intent to Defraud and 11 U.S.C. 544

198.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

199.    Between February 9, 2007 and January 7, 2009, Agape caused the Billing Transfers to be made to MSF as payment for legal fees and costs.

200.    Pursuant to the February 9, 2007 engagement letter between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over the funds once they were deposited in Agape's IOLA.

201.    The Billing Transfers were property in which Agape had an interest.

202.    The Billing Transfers were made with actual intent to hinder, delay and defraud Agape's creditors.

203.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Billing Transfers.

204.    Accordingly, the Billing Transfers are: (a) fraudulent under New York Debtor and Creditor Law §276 and (b) voidable under New York Debtor and Creditor Law §278.

205.    As a direct, foreseeable, and proximate result of the fraudulent transfers, Agape's creditors have been damaged and the Trustee seeks to set aside the fraudulent transfers to satisfy their losses.

206.    On October 11, 2007 and March 19, 2008, Agape caused the Cardinal Road Transfers to be made to MSF as payment for legal fees and costs, as set forth in detail above.

207.    Pursuant to the retainer agreement between Agape and MSF, as well as New York State Judiciary Law §497 (21 NYCRR §7000.8) and DR 9-102(B)(4) (22 NYCRR §1200.46), MSF maintained dominion and control over the Cardinal Road Transfers once the funds were deposited in Agape's IOLA.  Moreover, as alleged above, MSF exercised its dominion and control over these funds when it withdrew $28,574.87 from the account as payment for its legal fees in the form of the October 11, 2007 Transfer and the March 19, 2008 Transfer.

208.    The Cardinal Road Transfers were property in which Agape had an interest.

209.    The Cardinal Road Transfers were made with actual intent to hinder, delay and defraud Agape's creditors.

210.    MSF cannot meet its burden of establishing that it acted in good faith in accepting the Cardinal Road Transfers.

211.    Accordingly, the Cardinal Road Transfer are: (a) fraudulent under New York Debtor and Creditor Law §276; and (b) voidable under New York Debtor and Creditor Law §278.

212.    As a direct, foreseeable, and proximate result of the fraudulent transfers, Agape's creditors have been damaged and the Trustee seeks to set aside the fraudulent transfers to satisfy their losses.

52

213.    Pursuant to 11 U.S.C. §544, the Trustee may recover, for the benefit of the estate, all of the Billing Transfers made to MSF, in an amount to be determined at trial, but not less than $392,151.08, plus prejudgment interest.

214.    Pursuant to 11 U.S.C. §544, the Trustee may recover, for the benefit of the estate, all of the $28,574.87 in Cardinal Road Transfers made to MSF, plus prejudgment interest.

## SEVENTH CLAIM FOR RELIEF
### NEW YORK DEBTOR AND CREDITOR LAW §276-a – ATTORNEYS' FEES AND 11 U.S.C. 544

215.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

216.    Between February 9, 2007 and January 7, 2009, Agape caused the Billing Transfers to be made to MSF as payment for legal fees and costs.

217.    The Billing Transfers were made with actual intent to hinder, delay and defraud Agape's creditors.

218.    The Billing Transfers are: (a) fraudulent under New York Debtor and Creditor Law §276 and (b) voidable under New York Debtor and Creditor Law §278.

219.    Accordingly, pursuant to New York Debtor and Creditor Law §276-a, the Trustee may recover attorney fees to set aside the transfers made with intent to defraud.

220.    The Cardinal Road Transfers were made with actual intent to hinder, delay and defraud Agape's creditors.

221.    The Cardinal Road Transfers are: (a) fraudulent under New York Debtor and Creditor Law §276 and (b) voidable under New York Debtor and Creditor Law §278.

222.    Accordingly, pursuant to New York Debtor and Creditor Law §276-a, the Trustee may recover attorney fees to set aside the transfers made with intent to defraud.

## EIGHTH CLAIM FOR RELIEF
## CONTRIBUTION

223.    Plaintiff Trustee repeats and realleges herein each and every allegation made above. This claim is asserted against MSF pursuant to CPLR 1401 and 1402.

224.    Cosmo defrauded Agape's investors out of tens of millions of dollars. For instance, as described above, Cosmo caused Agape to sell unregistered securities to the Agape investors that contained numerous material misrepresentations and that violated both the Securities Act. Cosmo has pled guilty to mail fraud and wire fraud.

225.    Cosmo's fraud on Agape's investors has exposed Agape to hundreds of millions of dollars in liabilities to these investors. In fact, even before Agape was forced in bankruptcy, investors filed various complaints against Agape alleging, among other things, common law fraud, violation of the securities laws, and RICO violations.

226.    Agape's investors have now filed thousands of proofs of claims against Agape. Agape is liable to investors who have filed proofs of claims in the total amount of more than $80 million asserting liability based on tort and fraud.

227.    MSF's acts and omissions, as described above, caused or augmented the damages suffered by Agape's investors and give rise to contribution under one or more of the following bases of liability:

228.    Legal Malpractice / Professional Negligence.    As set forth above, MSF owed Agape the utmost duty of loyalty, candor, and good faith, as well as the duty to act as an objective attorney exercising that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community. MSF, however, failed to exercise reasonable and professional care in providing legal services to Agape. MSF's professional negligence caused and augmented the investors' damages by, among other things, enabling Cosmo to

54

continue to use Agape as a mechanism to illegally raise money from investors and misappropriate investor funds.

229.    Aiding and Abetting Breach of Fiduciary Duty to Agape's Investors.    Agape owed fiduciary duties to its investors.  Cosmo caused Agape to breach fiduciary duties it owed to Agape investors by, among other things, misappropriating investor funds.    MSF had actual knowledge that Cosmo was causing Agape to breach its fiduciary duties to Agape's investors by, among other things, using the investor funds in an unauthorized and illegal manner, including to pay personal expenses and to engage in risky and speculative commodities and futures trading. MSF substantially assisted these breaches of duty to Agape's investors, thereby causing or augmenting their injuries.

230.    In summary, MSF's tortious conduct funneled assets to Agape, expanded the Ponzi scheme, and permitted Cosmo's crimes to remain undetected while hundreds of millions of dollars of Agape's money was dissipated.   MSF's actions and inactions contributed to the damages the damages suffered by Agape's investors.  Thus, the Trustee seeks contribution from MSF for its proportionate share of damages to Agape's investors, in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEFT
### LEGAL MALPRACTICE / PROFESSIONAL NEGLIGENCE

231.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

232.    As Agape's counsel, MSF owed Agape a duty to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community.

233.    MSF knew that its acts and omissions would directly affect Agape.

234.    As counsel to Agape, MSF provided legal advice to Agape on a variety of issues as to which Agape requested advice, including advice in 2007 concerning whether Agape needed

to register to sell securities; advice in 2008 concerning whether Agape had been selling unregistered securities; and advice in October 2008 in response to investor complaints and inquiries. In rendering such legal advice, MSF failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community.

235.    MSF further breached its duty to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community in failing to advise Agape to correct misrepresentations made to the public regarding Agape's business activities and in connection with its unregistered sales of securities; assisting Cosmo's unauthorized use of Agape's fund for personal and other improper purposes, and failing to withdraw from a representation that entailed its continued assistance in an ongoing crime or fraud.

236.    But for MSF's negligent representation and breaches of duty, Agape would have avoided millions of dollars in damages dollars associated with its unregistered sale of securities to investors and the company's delay in filing for bankruptcy protection, among other damages.

237.    But for MSF's negligence, Cosmo's fraudulent scheme would have ceased long before January 2009. As described above, an objective attorney exercising that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community would not have assisted Cosmo in perpetuating and concealing an obvious Ponzi scheme.

238.    As a direct and proximate result of MSF's breaches of duty, Agape suffered damages in the millions of dollars in an amount to be proven at trial.

### TENTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY

239.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

240.    Agape engaged MSF as its general outside legal counsel. As such, MSF owed Agape fiduciary duties of care, obedience, loyalty, candor, and communication.

56

241.    MSF breached its duties by, among other things, subverting the professional-client relationship in such a manner that Agape's interests were subordinated to Cosmo's and MSF's.

242.    Once MSF knew, or should have known, that Cosmo was engaged in undisclosed and unauthorized commodities and futures trading, MSF should have reported his activities to Agape's investors and officers, or to the FCMs at which MSF knew Cosmo had opened accounts, or to the CFTC.  MSF's complicity in concealing Cosmo's trading, and its continued representation of Agape under these circumstances, required it to assist Cosmo in his perpetration of a fraud that hurt Agape and its investors.

243.    MSF's acts and omissions constituted breaches of fiduciary duty that proximately caused injury to Agape and its investors.  As a direct and proximate result of this harm, Agape has suffered very substantial damages.  Accordingly, Agape is entitled to, *inter alia*, the equitable remedy of forfeiture pursuant to which MSF must disgorge all professional fees received from, or on behalf of, Agape.

### ELEVENTH CLAIM FOR RELIEF
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

244.    Plaintiff Trustee repeats and realleges herein each and every allegation made above.

245.    As the president of Agape, Cosmo owed Agape fiduciary duties to at all times with the utmost good faith and fair dealing in Agape's best interests.

246.    Cosmo breached the fiduciary duty he owed to Agape by, among other things, using Agape's funds in an authorized and illegal manner, exposing the company to liability to its investors.

247.    MSF knew that Cosmo was breaching his fiduciary duty to Agape by using corporate funds, which had been raised from investors, in an unauthorized and illegal manner,

including to pay personal expenses and to engage in risky and speculative commodities and futures trading.

248.    MSF knowingly provided substantial assistance to Cosmo in his breaches of fiduciary duty to Agape.   As described above, MSF assisted Cosmo in his breaches of fiduciary duty by facilitating, among other things his illegal sale of securities and fraudulent commodities and futures trading.

249.    The conduct constituting breaches of fiduciary duty to Agape and its investors was exclusively adverse to their interests and provided no benefit to them.   Agape had one or more innocent stakeholders who:   (a) were not involved in the acts and omissions set forth above; (b) were not aware of Cosmo's breaches of fiduciary duty; and (c) were not were aware of MSF's knowing and substantial assistance in such breaches.

250.    Agape was directly and proximately damaged by MSF's knowing and substantial assistance in Cosmo's breaches of fiduciary duty, and Agape now seeks to recover these damages.

## RELIEF REQUESTED

**WHEREFORE,** the Trustee prays this Court to enter an order:

a)    On the Trustee's First Claim for Relief: (a) avoiding the fraudulent transfers pursuant to 11 U.S.C. §548(a)(1)(A); and (b) recovering, pursuant to 11 U.S.C. §550(a)(1), an amount to be determined at trial, but no less than $620,725.95, plus appropriate interest thereon;

b)    On the Trustee's Second Claim for Relief: (a) avoiding the fraudulent transfers pursuant to 11 U.S.C. §548(a)(1)(B); and (b) recovering, pursuant to 11 U.S.C. §550(a)(1), an amount to be determined at trial, but no less than $620,725.95, plus appropriate interest thereon;

c)    On the Trustee's Third through Sixth Claims for Relief: (a) avoiding the fraudulent transfers and conveyances pursuant to New York Debtor and Creditor Law §§373, 374, 375, 376 and 278; and (b) recovering, pursuant to 11 U.S.C. §544, an amount to be determined at trial, but no less than $620,725.95, plus appropriate interest thereon;

d)      On the Trustee's Seventh Claim for Relief:  Reasonable and necessary attorneys' and paralegal fees, together with all costs of court, pursuant to New York Debtor and Creditor Law §276-a;

e)      On the Trustee's Eighth Claim for Relief:  an amount to be determined at trial for contributing to damages suffered by investors in Agape in accordance with CPLR 1401 and 1402;

f)      On the Trustee's Ninth through Eleventh Claims for Relief: an award of damages for all actual and consequential losses suffered by Agape, in an amount to be determined at trial;

g)      Pre-judgment and post-judgment interest, pursuant to CPLR 5001 and 5004; and

h)      For such other and further relief as the Court deems just and appropriate in equity or law.

Dated: New York, New York
       June 22 , 2011

Respectfully submitted,

RUSKIN MOSCOU FALTISCHEK, P.C.
Mark S. Mulholland (MM-2084)
John A. DeMaro (JD-9649)
Robert F. Regan (RR-1143)
1425 RXR Plaza
Uniondale, New York  11556
Tel.:  (516) 663-6600
Fax:  (516) 663-6705
mmulholland@rmfpc.com
Jdemaro@rmfpc.com
rregan@rmfpc.com

*Special Litigation Counsel for Kenneth P. Silverman, as Chapter 7 Trustee of Agape World, Inc., et al.*

REID COLLINS & TSAI LLP
William T. Reid, IV (WR-5205)
Olivia A. Palmer (OV-7812)
30 Wall Street
New York, New York  10005
Tel.:  (212) 344-5200
Fax:  (212) 344-5299
wreid@rctlegal.com
opalmer@rctlegal.com

REID COLLINS & TSAI LLP
Barbara W. Balliette (*pro hac vice*)
Craig A. Boneau (*pro hac vice)*
4301 Westbank Drive
Building B, Suite 230
Austin, Texas  78746
Tel.:  (512) 647-6100
Fax:  (512) 647-6129
bballiette@rctlegal.com
cboneau@rctlegal.com